UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AMERICAN BRIDGE MANUFACTURING
COMPANY,

        Plaintiff and Counter-Defendant,

v.

        Case Number: 08-14315
        Honorable Julian Abele Cook, Jr.
        (consolidated with 09-11548 and
        09-14388)

WALTER TOEBE CONSTRUCTION COMPANY,
POU, INC. d/b/a ACE STEEL ERECTORS, INC.,
S.B. INC., SHERMAN BROS. HEAVY TRUCKING,
SHERMAN BROS. TRUCKING, AND E.R. EXPRESS,

        Defendants and Counter-Plaintiff,

and

WALTER TOEBE CONSTRUCTION COMPANY,

        Cross-Plaintiff

v.

POU, INC., d/b/a ACE STEEL ERECTORS, INC.,
S.B. INC., SHERMAN BROS. HEAVY TRUCKING,
SHERMAN BROS. TRUCKING, AND E.R. EXPRESS

        Cross-Defendants.

_____/

<u>ORDER</u>

    This action arises out of accusations by the American Bridge Manufacturing Company

("ABM") that the Defendants[1] breached their contractual obligations when they collectively failed

---

    [1]The complaint in Case No. 09-11548 identifies the Defendants as Walter Toebe
Construction Company "Toebe Construction"), POU, Inc. d/b/a Ace Steel Erectors, Inc. ("Ace

1

to deliver a steel beam to a designated construction site in Michigan, more commonly known to the parties as the I-96/Gateway Project ("Gateway Project").

On May 21, 2009, E.R. Express filed a motion for the entry of a summary judgment under Fed. R. Civ. P. 12(d) and 56(c). On July 16, 2009, ABM filed a motion which was designed to amend its complaint. During the following month (August 27, 2009), the Sherman Brothers filed a motion to dismiss the claim by ABM pursuant to Rule 12(b)(6), in which it asks the Court to treat this request as a motion for summary judgment under Rule 56(c). All of these motions are contested.

## I

Toebe Construction served as the prime contractor on the Gateway Project. This construction company entered into a subcontractual relationship with Ace Steel, which, in turn, hired ABM to manufacture and furnish large quantities of steel for the project. To find a company to transport a steel beam to the Gateway Project site, ABM enlisted the aid of the Sherman Brothers, transport brokers.[2] However, the parties disagree as to whether ABM and the Sherman Brothers had an oral

_____

Steel"), S.B. Inc., Sherman Bros. Heavy Trucking, Sherman Bros. Trucking, Inc. (collectively "Sherman Brothers")and E.R. Express. This action has been consolidated with (1) Case No. 08-14315, wherein ABM has sued the Toebe Construction for its alleged violation of the parties' contract and unjust enrichment arising out of a separate construction project known as "the I-94 / Joy Road Project" and (2) a lawsuit (Case No. 09-14388) which involves a claim by the ABM against the Fireman's Fund Insurance Company ("Fireman's Fund ").

[2]In this cause, Sherman Brothers assert that ABM's dealings were only with the S.B. Inc. - and not with Sherman Bros. Heavy Trucking or Sherman Bros. Trucking. Nevertheless, any reference by the Court to "Sherman Brothers" in this order - without more - will implicitly incorporate Sherman Bros. Heavy Trucking, Sherman Bros. Trucking and S.B., Inc. unless a plain reading will suggest otherwise. It should be noted that the consolidation of these corporations has been made by the Court only for reasons of simplicity and not for the purpose of giving emphasis to any issue or any party in this litigation.

contract (or whether the Sherman Brothers even served as ABM's broker). On the other hand, all

of them agree that the Sherman Brothers, after circulating the details of ABM's load request, entered

into a broker/carrier contract which obligated E.R. Express to deliver the steel beam safely to the

Gateway Project. On May 25, 2007, the E.R. Express tractor trailer that was carrying the steel beam

struck the I-94 highway overpass at Warren Avenue in Detroit, Michigan. As a result of the accident,

one person was killed and the steel beam was so badly damaged that ABM had to create a new one.

Fireman's Fund Insurance Company ("Fireman's Fund"), which has intervened into this case

and been granted permission to respond to the pending summary judgment motions, acknowledges

that ABM presented a claim for the replacement cost of the damaged steel beam.[3] The loss form

identified the damaged property as a "Girder" for which ABM claimed total ownership.

Furthermore, it listed $88,454 (Eighty Eight Thousand, Four Hundred Fifty-Four dollars)[4] as the

price that Fireman's Fund would be asked to pay for the loss.[5] This loss form further indicated, in

relevant part, that "(i)n consideration of the payment made, the Insured hereby subrogates the

Company to all rights, title and interest in and to the property for which claim is being made to the

extent of such payment." (Proof of Loss Form, Exhibit A-1 to Fireman's Fund Memorandum in

Response to E.R. Express Motion for Summary Judgment).

---

[3]This claim form ("Advance Payment Sworn Statement in Proof of Loss") was issued by Fireman's Fund in connection with its existing insurance policy with ABM. However, a copy of this insurance policy has not been furnished to the Court.

[4]As will be apparent upon a continued reading of this order, there seems to be a discrepancy between the amount listed in the loss form ($88,454) and the amount later referenced in the parties' dealings ($88,434) regarding the value of the beam.

[5]According to the loss form, $93,454 was the "Original Girder Price," and it appears that the Fireman's Fund arrived on a figure of $88,454 for reimbursement after subtracting $5,000 for the deductible.

ABM received its requested $88,434 from its insurer, Fireman's Fund, as compensation for the destroyed steel beam. However, ABM also contends that these monies only represented a partial payment of its losses because the steel beam was actually valued at $217,086. ABM argues that, without its knowledge or consent, Fireman's Fund subsequently demanded that E.R. Express' insurance carrier, Canal Insurance, reimburse it for the monies that were paid to ABM. On November 12, 2008, Canal Insurance (without disputing the demand) paid the requested amount (to wit, $88,434) to Fireman's Fund, and, thereafter, entered into a Settlement and Release agreement which released this insurance carrier as well as Eligah Revenkov, among others, for all claims relating to the destruction of the steel beam. The relevant portions of the Release are as follows:

> *(Fireman's Fund Ins. Co. aso American Bridge Co.),* for itself and for its affiliated corporations, subsidiary corporations, divisions and its agents, servants, employees, officers, directors, insurers, successors and assigns (hereinafter referred to as **"Releasor"**) and each and every one of them, hereby acknowledges receipt of payment of ***eighty-eight thousand four hundred thirty four & 00/xxx ($88,434.00)*** by Canal Insurance Company on behalf of ***Eligah Revenkov*** (its insured).

> In consideration for the payment made herein, Releasor does hereby fully and completely remise, release and forever discharge ***Canal Insurance Company*** and their affiliated corporations, related corporations, parent corporations, subsidiary corporations, divisions and reinsurers, successors and assigns (hereinafter collectively referred to as ("Releasees")) and each and every one of them of and from all known and unknown claims, demands and causes of action of every type and description which Releasor now has or claims to have or which may hereafter accrue against said Releasees or any one or more of them arising from, growing out of or related in any way to ***destruction of concrete bridge beam during transit in or around Detroit, MI on 25 May 08***.

> In further consideration for the payment made herein, Releasor does hereby remise, release and forever discharge Eligah Revenkov and its affiliated corporations, related corporations, parent corporations, subsidiary corporations, divisions and they and their agents, brokers, attorneys, servants, employees, officers, directors, insurers, reinsurers, successors and assigns (hereinafter collectively referred to as "Insured Releasees") and each and every one of them for all amounts in excess of ***(0),*** for all known and unknown claims, demands and causes of action of every type and description which Releasor now has or

claims to have or which may hereafter accrue against said Insured Releasees or any one or more of them arising from, growing out of or related in any way to subject claim.

. . .

Releasor understands that its only recourse remaining after execution of this release is a claim for recovery of (0) against Eligah Revenkov.  The individual signing this Release on behalf of Releasor is competent to do so, and has the authority of Releasor to do so.

Releasor represents and warrant [sic] that it is the only party entitled to pursue the claim that is the subject of the foregoing Release.  Releasor further represents and warrants that it has not assigned any rights to any person or legal entity and has no knowledge of any other party with an interest in the cargo which is the subject of the release.  Releasor agrees to defend, indemnify and hold harmless Releasee from any claim or suit asserted by another party for the loss released herein, and Insured Releasee from any claim or suit asserted by another party for any amount in excess of (0). (Settlement and Release 1-2) (Emphasis in the original).

According to ABM, it has been subjected to a claim by Toebe Construction of  more than two million dollars in damages which are allegedly separate from the cost of (1) the steel beam or (2) transporting the steel beam (and those costs that are associated with "cold weather inefficiencies, heating and housing/erection costs, home office overhead and idle equipment demobilization and remobilization.").  ABM further claims that Toebe Construction has purposely withheld approximately one hundred forty-five thousand dollars from it on another unrelated job (i.e.,the "I-94/Joy Road Project").  ABM seeks, *inter alia*, to hold the Sherman Brothers and E.R. Express responsible for these costs under a breach of contract theory.  Therefore, a proper interpretation of the Release form is central to the resolving this dispute.

## II.

Under Federal Rule of Civil Procedure 56(c), a  motion for a summary judgment should be granted if a party "show[s] that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."  The burden is upon the movant to demonstrate the absence of a genuine issue of a material fact.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986). In assessing a summary judgment motion, the Court examines pleadings, depositions, answers to interrogatories, admissions, and affidavits in a light that is most favorable to the nonmoving party. Fed. R. Civ. P. 56(c); *Boyd v. Ford Motor Co.,* 948 F.2d 283, 285 (6th Cir. 1991); *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984). It is the responsibility of the court to determine "whether . . . there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A dispute is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Hence, a summary judgment must be entered only if (1) the evidence clearly suggests that the contested matter is "so one-sided that [the proponent] must prevail as a matter of law," *id.* at 252, or (2) the opponent fails to present evidence which is "sufficient to establish the existence of an element essential to its case, and on which it will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Importantly, the presentation of a mere scintilla of supporting evidence is insufficient. *See Anderson*, 477 U.S. at 252, *quoted in Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989).

Inasmuch as this is a diversity case, the Court must apply the law of Michigan on the basis of the doctrine that was established by the Supreme Court in *Erie R. R. Co. v. Tompkins*, 304 U.S. 64 (1938). An analysis follows.

## A.

E.R. Express asserts that the entry of a summary judgment in its favor is appropriate in light of the Release form executed by the Fireman's Fund. According to the law in Michigan, the entry of a summary judgment/disposition of a claim is proper in those situations in which a valid release of liability exists between the parties. *Wyrembelski v. St. Clair Shores*, 218 Mich. App. 125, 127

(1996). The validity of a release depends upon the intent of the parties. However, it should be noted that in order for a release to be enforceable, it must be "fairly and knowingly made." *Batshon v. Mar-Que General Contractors, Inc.*, 463 Mich. 646, 650 n.4 (2001). As with any other contract, and if the terms of a release are clear and unambiguous, a court must discern the parties' intent by looking to the plain and ordinary meaning of the language. *Id.*

Here, the Court must first determine if ABM is bound by the Release. In the very first sentence of the document, the parties define the Releasor as "*(Fireman's Fund Ins. Co. aso American Bridge Co.)*, for itself and for its affiliated corporations, subsidiary corporations, divisions and its agents, servants, employees, officers, directors, insurers, successors and assigns . . . ." E.R. Express acknowledges that the only possible reference to ABM is in the clause, "Fireman's Fund Ins. Co. aso American Bridge Co."[6] The parties appear to agree that "aso" is a shorthand version of the phrase "as subrogee of," which connotes "[t]he substitution of one person in the place of another with reference to a lawful claim, demand or right." *Allstate Ins. Co. v. Snarski*, 174 Mich. App. 148, 154 (1988). Under subrogation principles, the subrogee, "upon paying an obligation owed to the subrogor as the primary responsibility of a third party, is substituted in the place of the subrogor, thereby attaining the same (and no greater) rights to recover against the third party." *Morrow v. Shah*, 181 Mich. App. 742, 749 (1989). But, payment of the subrogated debt or liability is a prerequisite to attaining subrogation rights. *Id.*

---

[6]Although ABM has attempted to distinguish itself from ABC (American Bridge Co), its argument is unpersuasive. According to their website, (to wit, www.americanbridge.net,) ABM and ABC appear to be distinct organizations that fall under the umbrella of the same parent company. Moreover, ABM does not dispute that it received payment from the Fireman's Fund for the steel beam. If, in fact, it did not own the steel beam when the accident occurred, it would be illogical to allow this Company to proceed with its claims against E.R. Express.

It is interesting to note that the parties devoted a significant portion of their briefs to the issue of whether Fireman's Fund had the authority to release any claims by ABM against E.R. Express. ABM points to (1) the affidavit of Ralph Whitney, who avers that (a) he first saw the limited Release form as an attachment to E.R. Express' pleading and (b) American Bridge never authorized the insurer to settle or release "all" claims related to the Gateway Project; (2) the affidavit of Dale Ward, an attorney for Fireman's Fund, who fully agrees with Whitney's position; and (3) a series of Michigan cases which establish that an agent must have the specific authority to settle a case. ABM - as it relates to this case - argues that the only persons who were authorized to act under this limited Release were the Fireman's Fund and "its affiliated corporations, subsidiary corporations, divisions and its agents, servants, employees, officers, directors, insurers, successors and assigns . . . ."

To support its argument, ABM points to *Batshon*, *supra,* where the Michigan Supreme Court held that the language which released "AAA of Michigan, his/her/their executors, administrators, and all persons or organizations responsible for his/her/their acts . . ." did not refer broadly to "all persons or organizations." *Batshon* at 649-650. Rather, it held that the use of term "his/her/theirs" was unmistakably a substitute for AAA Michigan and that, therefore, the language pertained to all persons or organizations only insofar as they might be responsible for AAA Michigan's acts. *Id.*

Fundamentally, however, ABM's arguments fail to account for the unique nature of subrogation rights in Michigan. Once the Fireman's Fund payment was accepted by ABM as compensation for its loss, the law of subrogation came into immediate effect. As such, it stood in ABM's shoes by operation of law and essentially acquired a legal status upon which to recoup its

costs from third parties.[7]  *See, e.g. Tarzwell v. State Farm Mutual Auto. Ins. Co.*, unpublished per curiam opinion of the Michigan Court of Appeals, issued June 3, 3008 (No. 276381) (allowing claim by State Farm as secondary insurer to proceed against Blue Cross as primary insurer even though insured party had dismissed its lawsuit against Blue Cross, because "at the moment that State Farm paid the claim, State Farm became subrogated to plaintiff's rights and plaintiff had no ability to sign away State Farm's rights.").  Logically, the Fireman's Fund's authority would also extend to ABM's former ability to enter into settlement agreements with third parties such as Canal Insurance and E.R. Express.  Inasmuch as Fireman's Fund had already paid ABM and was acting as its subrogee, this insurance carrier had the legal authority to sign away certain rights that otherwise could have only been asserted by ABM.

That notwithstanding, there still remains a valid question about the scope of the now-challenged Release form.  Both ABM and Fireman's Fund note that a subrogee merely stands in the place of the subrogor, thereby attaining the same (and no greater) rights to recover against the third party.  *Morrow, supra* at 749.  In this regard, ABM submits that because Fireman's Fund only compensated ABM for a fraction of the steel beam's claimed full value, the Release form is limited and only extends to $88,434.  Moreover, pointing to the affidavit of Ralph Whitney, ABM claims that the insurance policy was for first-party property coverage only.  In its view and since the policy did not provide coverage for third-party claims of the type which has been asserted by Toebe Construction against ABM, Fireman's Fund did not acquire any subrogation rights with respect to such claims.  Fireman's Fund takes a similar position, noting that its $88,434 payment for the

---

[7]Fireman's Fund concedes this point in its responsive pleadings and argues that it has a right of subrogation for the amount that it paid for the damage to the girder.

damage to the girder fixed the amount that it could claim from Canal, and did not extend to any other potential claims, including those that are the subject of the litigation in the case at bar.

The plain, unambiguous language of the Release form does not support the arguments by ABM and the Fireman's Fund. By its terms, the document released Eligah Revenkov and its related entities from all amounts in excess of ***(0)*** "for all known and unknown claims, demands and causes of action of every type and description which Releasor now has or claims to have or which may hereafter accrue against said Insured Releasees or any one or more of them arising from, growing out of or related in any way to ***destruction of concrete bridge beam during transit in or around Detroit, MI on 25 May 08***" (emphasis in original).[8] Notwithstanding the contentions by ABM and the Fireman Fund, the scope of the released claims is broad, in that the Release form unambiguously indicates that Eligah Revenkov and its affiliates will be released from liability for "all" claims - both known and unknown, and from causes of action of "every type and description" so long as they are "arising from, growing out of or related in any way" to the destruction of the beam. Quite clearly, the language within the Release form is sufficiently comprehensive and encompasses a wide scope of potential claims against Canal Construction and Eligah Revenkov as well as its affiliates. Indeed, the courts in Michigan have previously acknowledged that there is no broader classification than one that uses the word "all." *Romska v. Opper,* 234 Mich. App. 512, 515 (1999), overruled on other

---

[8]ABM correctly notes that the Release form appears to contain two typographical errors: namely, (1) a reference to a concrete beam, rather than a steel beam and (2) a notation that the accident occurred on May 25, 2008, whereas May 25, 2007 is the actual date of the accident. However, these variations do not render the Release form ambiguous, inasmuch as the terms are easily recognized as mistakes. To accept them literally would mean that Canal Construction had agreed to pay ABM for a nonexistent steel beam that was damaged during a nonexistent accident. Thus, the Court rejects ABM's argument which, if construed literally, would render this contract ambiguous which, in turn, would require the need for an interpretation through the use of parol evidence.

grounds by *Shay v. Aldrich,* No. 138908, 2010 WL 3326673, *1+ (Mich. Aug 23, 2010) (order of the Michigan Supreme Court).[9] ABM's argument that this broad language is limited by the more specific reference to claims related to the "destruction of [the] . . . bridge beam during transit" does not change this result. ABM is correct in noting that in certain circumstances, a release that is otherwise very broad can be limited by a more specific narrow reference to a particular fact or circumstance. *See, e.g. Elliot Investment Co. V. Pule Home Services, LLC*, unpublished opinion per curiam of the Michigan Court of Appeals, No. 279929 (Mich. App. Dec. 30, 2008) (inasmuch as the release "explicitly affect[ed] claims that have some foundation in a specified transaction between the parties, . . . it therefore impliedly *excludes* claims that are not connected to that transaction.") (emphasis in original).

In this case, it is clear that the challenged release covers only those damages related to the destruction of the beam. But, contrary to the argument by ABM and Fireman's Fund, the damages sought through this litigation (which reflect the damages asserted by Toebe Construction against ABM) are reasonably foreseeable and thus can be said to have "arisen from," "grown out of," or been "related in some way" to the destruction of the steel beam. Although the extent of those damages as claimed by Toebe Construction may be speculative, it does not require a leap of logic to conclude that the destruction of a key steel beam could proximately cause the entire construction project to be delayed into the winter months based on a need to refabricate the beam. Indeed, this finding is

_____

[9]In *Shay,* the Michigan Supreme Court rejected *Romska*'s rule that courts could not look to parol evidence to learn the true scope of a release. Instead, the *Shay* court held that it is permissible to look to "extrinsic evidence of the intended scope of a release when an unnamed party seeks to enforce third-party-beneficiary rights based on the broad release language but the evidence presented establishes that an ambiguity exists with respect to the intended scope of the release." *Shay* at 2010 WL 3326673, *5. Here, inasmuch as the evidence has not established that the challenged release is ambiguous, *Shay*'s threshold requirements have not been met.

supported by ABM's claims against the Sherman Brothers and E.R. Express. Specifically, the complaint alleges that it was foreseeable that the failure to deliver the girder in the proper manner would cause ABM to breach its claims with Ace Steel and result in a lawsuit with Toebe Construction and others on the Gateway Project. (ABM complaint in Case No. 08-14315). Moreover, inasmuch as the Gateway Project was located on a major avenue of travel, one could reasonably foresee the need for Toebe Construction to assess and attend to the damages as quickly as possible - perhaps, even around the clock - to restore the use of the affected construction area. Because the extra costs that are associated with such a demand can be fairly attributed to the claimed destruction of the steel beam, the Court rejects ABM's arguments that the release does not bar its claims.

This case is distinguishable from *Cook v. Shensky* - an unpublished per curiam opinion of the Michigan Court of Appeals, No. 246913 (Mich. App. June 15, 2004), upon which ABM relies. In *Cook,* the appellate court found a break in the causal link between a car accident (which injured the plaintiff's finger and was the subject of a release), and burns that were later sustained by him in the follow-up medical treatment for his finger. *Cook* at *3 (observing that "[the hospital's] alleged negligence was not related to the automobile accident[,]" and that while "in a broad sense, the alleged medical malpractice 'grew out of' or was 'a consequence of' plaintiff's finger injury which resulted from the accident[,] . . . . the burn to plaintiff's arm, was proximately caused by the alleged acts of [the hospital], not the automobile accident."). Here, by contrast, neither ABM nor Fireman's Fund have presented the Court with evidence of an intervening or superseding event that arose to break the causal chain between the destruction of the steel beam and the costs associated with the resulting delays of the Gateway construction project. Inasmuch as the release applies to the claims asserted by ABM in this lawsuit, the Court finds that E.R. Express is entitled to a summary judgment as a

matter of law.

Alternatively, E.R. Express claims that it is entitled to a summary judgment because ABM is not a third-party beneficiary to its broker/carrier contract with the Sherman Brothers. In Michigan, its third-party beneficiary statute, Mich. Comp. Laws § 600.1405, reads in pertinent part:

> Sec. 1405. Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

The Michigan Supreme Court, in its interpretation of this statute, has opined that it was the intention of the Legislature to assure that the contracting parties are "clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract." *Schmalfeldt v. North Pointe Ins. Co.,* 469 Mich. 422, 428 (2003). Using an objective standard, the Michigan Supreme Court concluded that it must determine "from the form and meaning of the contract itself, whether the promisor undertook to give or to do or to refrain from doing something directly to or for the person claiming third-party beneficiary status." *Id* (internal citations omitted). Michigan courts have held that only intended - not incidental- third-party beneficiaries may sue for a breach of a contractual promise in their favor. *Auto-Owners Ins. Co. v. Keizer-Morris, Inc.,* 284 Mich. App. 610, 613 (2009) (an injured person not named in an insurance contract is not necessarily a third party beneficiary, but may merely be an incidental beneficiary).

Here, it appears that ABM was, in fact, a third-party beneficiary to the contract between E.R. Express and the Sherman Brothers. After reviewing the excerpts of the fifteen page contract that

were submitted to the Court (by the Defendants - not ABM), it appears that E.R. Express and the Sherman Brothers undertook a duty to "do, give or refrain from doing something directly to or for" ABM's benefit as contemplated by Mich. Comp. Laws § 600.1405.  First, it is clear from the record that the parties had agreed to transport and insure ABM's property, even though the contract did not specifically attribute the steel beam to ABM.  In this document, it appears that E.R. Express, as the carrier, agreed "to transport . . . such quantities of authorized commodities as [the Sherman Brothers] may require . . . ." It later describes the steel beam in such general terms as "this load," "cargo," and a "Bridge Girder," and then specifies its weight and dimensions.  (E.R. Express and the Sherman Brothers Transportation Agreement, Exhibit B to E.R. Express' Motion for Summary Judgment). The document also notes that E.R. Express "agrees to maintain cargo insurance in the minimum amount of $100,000 to compensate BROKER, owner or consignee for loss or damage to property which comes into the possession of CARRIER in conjunction with its transportation services." It also indicates that  the carrier "shall be liable to the consignee, consignor, or owner of goods, and BROKER for failure to tender or timely transport freight under this agreement if such failure is due to . . . negligence by the CARRIER."  (emphasis in the two preceding sentences in original).

Although the agreement never identifies ABM with specificity, it appears that E.R. Express and the Sherman Brothers may have specifically intended that their agreement would inure to the benefit of ABM as the claimed owner of the steel girder from the standpoint of (1) insuring against damage to the steel beam and (2) making the carrier liable for an untimely transport.  Unfortunately, ABM's responsive pleading does not develop its claim that it was an intended third-party beneficiary to the contract between E.R. Express and the Sherman Brothers.  As such, it provides little guidance on this issue.  Yet, based on the existing record, the Court must deny E.R. Express' alternate motion

for summary judgment as to this count.

Finally, E.R. Express and the Sherman Brothers collectively argue that the claims by ABM are governed by the Michigan No Fault Act, Mich. Comp. Laws, 500.3145(2). which provides, in relevant part, that "[a]n action for recovery of property protection insurance benefits shall not be commenced later than 1 year after the accident." *Id.* In outlining the scope of "property protection insurance benefits," this statute provides that "an insurer is liable to pay benefits for accidental damage to tangible property arising out of the ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle." Mich. Comp. Laws § 500.3121(1). Furthermore, the Michigan No Fault Act defines "damage to tangible property" as a "physical injury to or destruction of the property and loss of use of the property so injured or destroyed." Mich. Comp. Laws § 500.3121(3).

Based upon the existing record, it appears that this Michigan statute would govern ABM's state law claims. ABM cannot seriously dispute that its tangible property (i.e., the steel beam) was accidentally damaged while E.R. Express was using a motor vehicle. *See, e.g., Travelers Property Cas. Co. Of America v. Ohio Cas. Group,* unpublished per curiam opinion of the Michigan Court of Appeals, No. 262249 (Nov. 21, 2006) (finding that accident was covered by Michigan's No-Fault Act where truck used for snow removal allegedly caused a parking garage to collapse since truck was engaged in a transportational function at the time of the accident, and thus collapse arose out of the "ownership, operation, maintenance, or use of a motor vehicle as a motor vehicle" under this statute). Although the accident occurred in May of 2007, ABM did not file its lawsuit until April of 2009 - nearly two years later. By virtue of the language of the statute, ABM's state law property claims would be time-barred. That notwithstanding, these Defendants have not provided the Court with any law to support their argument that the Michigan No Fault Act completely preempts and prohibits any

cause of action under federal law. On the other hand, ABM contends that the Michigan No Fault Act

is inapplicable to its claims since, as a motor carrier in interstate commerce, E.R. Express is subject

to liability under 49 U.S.C. § 14706(a)(1). However, inasmuch as ABM's original complaint does

not contain a Carmack Amendment claim, 49 U.S.C. 14706 et seq, the Court grants the movants'

motions for summary judgment as to ABM's state law property claims.

## B.

The Sherman Brothers deny that it has any implied or oral contract with ABM. In order for

an implied contract have legal efficacy, there must be "(1) parties competent to contract; (2) a proper

subject matter; (3) consideration; (4) mutuality of agreement; and (5) mutuality of obligation."

*Mallory v. Detroit*, 181 Mich. App. 121, 127 (1989). Moreover, a meeting of the minds must occur

on all of the material facts. *Kamalnath v. Mercy Mem. Hosp.*, 194 Mich. App. 543, 548 (1992). To

determine whether mutual assent has occurred, a court is encouraged to examine "the express words

of the parties and their visible acts." *Id.* Michigan courts will recognize an implied contract in those

situations where the parties assume obligations by their conduct, or based on what ABM calls the

parties' course of dealing. *Williams v. Litton Sys., Inc.*, 433 Mich. 755, 758 (1989).

Here, relying upon the affidavit of Fred Jacquot (ABM's Project Manager for the Gateway

Project), ABM asks the Court to recognize that it had an implied contractual relationship with the

Sherman Brothers during all of the relevant times in this controversy. Jacquot avers that the Sherman

Brothers agreed to make arrangements for the proper and timely transportation of the steel beam from

his Company's fabrication plant in Oregon to the Gateway Project in Michigan. According to him,

the agreed charge to ABM was $15, 500. But, he claims that, consistent with past practices within

the industry in the handling of over ninety contracts since 2004, the parties did not execute any

purchase order or a written contract which memorialized the parties' agreement. Jacquot asserts that some of the Sherman Brothers' other obligations included a duty to (1) provide or arrange for a competent carrier; (2) assess the capability of the carrier's truck to transport the steel beam safely, (3) obtain or arrange for state permits and delivery routes, and (4) assure the steel beam was delivered by May 25, 2007. ABM also points to the deposition testimony of Christina Sonneman, one of the Sherman Brothers' agents, who allegedly confirmed that her Company had been retained as a broker "to transport [the] load." (ABM's Response to the Sherman Brothers' motion, Exhibit 9 at 45).

The Sherman Brothers dispute ABM's characterizations of the affidavit by Christina Sonneman. These Defendants submit that she denied the existence of a contract which required the Sherman Brothers to serve as the trucking company to transport the steel beam. Furthermore, the Sherman Brothers assert that all details relating to transportation, pick up and delivery dates, permits and the method for handling the load were exclusively arranged between E.R. Express and American Bridge.

These competing affidavits reveal the existence of a clear genuine issue of a material fact as to whether the parties did have an implied contract. Therefore, it would be inappropriate for the Court to render a decision on the currently pending motion for a summary judgment, especially in light of the request by ABM under Rule 56(f) in which it contends that the Sherman Brothers have been uncooperative in responding to its discovery requests. However, the decision by the Court on this motion by the Sherman Brothers depends upon the applicability of the Release form to this Defendant.[10]

---

[10]Alternatively, the Sherman Brothers argues that even if the Court believes that ABM can prove the existence of an implied contract, it cannot establish the requisite elements for a breach of a contract or for damages. Nevertheless, the affidavit of Fred Jacquot raises a genuine

For the above-stated reasons, it is clear that the Release form binds ABM since the Company surrendered its rights to Fireman's Fund upon accepting payment for its insurance claims. Moreover, to the extent that the Release form specifically absolves "Eligah Revenkov and its . . . brokers" from future liability related to the destruction of the steel beam, the Sherman Brothers, the broker for E.R. Express on this deal (as established by the E.R. Express and the Sherman Brothers Transportation Agreement), is covered by the Release form. ABM argues that the challenged release is invalid as to this Defendant because it did not extend any consideration to Fireman's Fund in exchange for its rights under the contract. Michigan courts have rejected similar arguments in finding that "[c]onsideration for a promise may inure to one other than the promisor," *Schofield v. Spilker,* 37 Mich. App. 33, 38 (1971). *See also, Rinke v. Automotive Moulding Co.,* 226 Mich. App. 432, 438 (1997), in which the Michigan appellate court rejected the plaintiff's argument that the defendants could not rely on the release because they did not provide any consideration. Since the defendants fell within one of the categories of entities named in the release, the court deemed the defendants to be third-party beneficiaries of the release who were entitled to stand in the shoes of the main releasor to assert defenses thereunder. Based upon this reasoning, the Court grants the Sherman Brothers' motion for a summary judgment.

### C.

Rule 15 of the Federal Rules of Civil Procedure, which governs the amendment of pleadings,

---

issue of a material fact as to whether the Sherman Brothers violated the terms of an implied contract by failing to, among other things, (1) ensure that the steel beam was delivered timely and in good condition; (2) verify the experience, licensing and qualifications of the E.R. Express driver; (3) properly load the steel beam; and/or (4) competently arrange for permits and delivery routes. Furthermore and for summary judgment purposes, Jacquot's affidavit sufficiently alleges that ABM experienced foreseeable damages based on significant delays caused by the accident.

allows courts to permit amendment "when justice so requires."  A party must act with due diligence if it intends to take advantage of the liberal standard of the Rule which asserts that applications for leave to amend should be freely given.  *See United States v. Midwest Suspension & Brake, 49 F.3d 1197, 1202* (6th Cir.1995) (affirming the district court's denial of a Rule 15(a) motion because plaintiff had waited more than two years to attempt to amend its complaint a second time, and, thereby, failed to demonstrate due diligence).  To the extent that ABM acknowledges that its proposed amended counts would  apply to E.R. Express only, the Sherman Brothers do not possess any standing to assert this defense.  Even if the Court concluded that the Sherman Brothers did have standing, it has not established that ABM, in failing to plead these claims initially, was dilatory and should be denied an opportunity to amend its complaint.

According to Fed. R. Civ. P. 15(a)(2), a court may "freely give leave [to amend a pleading] when justice so requires."  This Rule reaffirms the principle that cases should be tried on their merits "rather than [on] the technicalities of pleadings."  *Moore v. City of Paducah*, 790 F.2d 557, 559 (6th Cir.1986) (quoting *Tefft v. Seward*, 689 F.2d 637, 639 (6th Cir.1982)).  But, if a proposed amendment would not survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court may also disallow the amendment because of its inevitable futility.  *Thiokol Corp. v. Dept. of Treasury*, 987 F.2d 376, 382 (6th Cir.1993).

In the opinion of the Court, to allow ABM to amend its complaint for the purpose of adding a claim under the Carmack Amendment would be futile inasmuch as such a count would have been encompassed by the broad scope of the Fireman's Fund release.  To establish a prima facie claim under the Carmack Amendment, a plaintiff must demonstrate that the shipment (1) was in good condition at the point of origin, (2) arrived in a damaged condition at the point of destination, and (3)

was damaged. *Plough, Inc. v. Mason and Dixon Lines*, 630 F.2d 468, 470 (6th Cir.1980) (citing *Missouri Pacific R.R. Co. v. Elmore and Stahl*, 377 U.S. 134, 138 (1964)).  ABM has identified facts in this litigation that could, arguably, support each element of such a claim.  *See also, Toledo Ticket Co. v. Roadway Exp., Inc*., 133 F.3d 439, 441 (6th Cir.1998) (the Carmack Amendment to the Interstate Commerce Act is broad in its preemptive effect on state tort claims arising out of the transportation and delivery of goods.); *See also, W.D. Lawson & Co. v. Penn Central Co.*, 456 F.2d 419, 421 (6th Cir.1972). Yet, ABM has failed to explain why a Carmack Amendment claim would not be precluded by the language which released Eligah Revenkov "from all known and unknown claims, demands and causes of action of every type and description which Releasor now has or claims to have or which may hereafter accrue against said Releasees or any one or more of them arising from, growing out of or related in any way to ***destruction of concrete bridge beam during transit in or around Detroit, MI on 25 May 08***." Inasmuch as a claim under the Carmack Amendment necessarily depends upon a showing that a shipment was damaged in transit, this count would be completely foreclosed by the terms with the Release form.  Therefore, the  motion to amend to add this count must be denied.

The Court must also deny ABM's request to add an additional count for the reformation of the Release.  A court may reform an instrument which will reflect the parties' actual intent "where there is clear evidence that both parties reached an agreement, but as the result of mutual mistake, or mistake on one side and fraud on the other, the instrument does not express the true intent of the parties." *Mate v. Wolverine Mut Ins Co*, 233 Mich. App 14, 24 (1998).  Here, ABM was not a formal party to the Release form between Fireman's Fund and E.R. Express.  In reality, as a subrogor, ABM's rights have been extinguished, and Fireman's Fund merely stood in ABM's shoes.  Thus,

ABM cannot establish, by clear and convincing evidence, that it reached any kind of an agreement with E.R. Express or the Sherman Brothers, let alone persuade the Court that the agreement was based on fraud and/or mutual mistake. Because ABM would be unable to satisfy this claim as a matter of law, the Court denies ABM's motion to amend its complaint to add a count for reformation.

III.

In light of the Fireman's Fund Release, E.R. Express' and the Sherman Brothers' motion for a summary judgment as to ABM's claims against them must be, and are, granted. Moreover, the request by ABM to amend its complaint is denied.

IT IS SO ORDERED.

Dated: <u>September 22, 2010</u>        <u>s/Julian Abele Cook, Jr.</u>
       Detroit, Michigan              JULIAN ABELE COOK, JR.
                                United States District Court Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 22, 2010.

<u>s/ Kay Doaks</u>
Case Manager